FILED
United States Court of Appeals
Tenth Circuit

December 17, 2012

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellant,

v.

MANUEL SANTISTEVAN,

      Defendant - Appellee.

No. 11-1534

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 08-CR-00113-WJM-1)**

Patricia Davies, Assistant United States Attorney, (and John F. Walsh, United States Attorney, on the briefs), Denver, Colorado, for Plaintiff - Appellant.

Michael Zwiebel of Springer and Steinberg, P.C., Denver, Colorado, for Defendant - Appellee.

Before **KELLY**, **SEYMOUR**, and **TYMKOVICH**, Circuit Judges.

**KELLY**, Circuit Judge.

      The government appeals from an order of the district court granting

Defendant-Appellee Manuel Santistevan's motion to suppress statements made

after invoking the right to counsel. Mr. Santistevan was indicted on three counts

of interference with commerce by robbery, 18 U.S.C. §§ 1951, 2, and using and carrying a dangerous weapon during the commission of a violent crime, 18 U.S.C. §§ 924(c), 2; possession of a firearm by a previously convicted felon, 18 U.S.C. § 922(g)(1); and possession of a short-barreled shotgun, 26 U.S.C. § 5861(d). The district court held that Mr. Santistevan unambiguously invoked the right to counsel when he gave an agent of the Federal Bureau of Investigation ("FBI") a letter from his attorney indicating that he did not wish to speak without counsel. Because the agent continued to interrogate Mr. Santistevan, the district court suppressed the incriminating statements that Mr. Santistevan subsequently made. We have jurisdiction pursuant to 18 U.S.C. § 3731, and we affirm.

Background

In the summer of 2007, the FBI was investigating a series of robberies in the Denver area. Aplt. App. 133–34. Mr. Santistevan became a suspect in these robberies, and FBI Agent Eicher ("agent") obtained a warrant for his arrest. Id. at 137. On August 30, 2007, Mr. Santistevan turned himself in on other, unrelated charges that were pending in Jefferson County, Colorado. Id. at 141–42. The agent went to the police department to meet with Mr. Santistevan, advised him of his Miranda rights, and asked if he wanted to speak about the robberies. Id. at 141. Mr. Santistevan declined, and the interview ended. Id.

Six days later, on September 5, 2007, the agent received a phone call from

- 2 -

Mr. Santistevan's girlfriend, Tiffani Bryan. Id. at 142. The agent knew of Ms. Bryan because he had previously interviewed her about the robberies. Id. Ms. Bryan told the agent that Mr. Santistevan wanted to speak with him, and asked if he could meet Mr. Santistevan at the jail that night. Id. at 142–43. The agent could hear Ms. Bryan speaking to someone else on another phone line, and believed that this person was Mr. Santistevan. Id. Because it was late at night, he told Ms. Bryan that he would visit Mr. Santistevan the next morning. Id. at 143.

The following morning, while traveling to the jail, the agent received a phone call from Katherine Spengler, a public defender ("attorney"). Id. at 144–45. The attorney advised him that she represented Mr. Santistevan, had spoken with him that morning, and that he did not wish to speak. Id. The agent informed the attorney of his conversation with Ms. Bryan the previous night and indicated that he intended to visit Mr. Santistevan to "ask him directly if he wanted to make any statements or answer my questions." Id. at 145. The attorney responded that she had given Mr. Santistevan a letter to give to the agent if he went to the jail. Id.

When the agent arrived at the jail, he told Mr. Santistevan that he had spoken to an attorney who claimed to represent him and asked if he had a letter. Id. at 145–46. Mr. Santistevan handed him the following letter:

9/6/2007

Agent Icker [sic]:

My name is Katherine Spengler.  We spoke last week.  I have been in touch with Sue Fisher from the Federal Public Defender's Office.  At this point, Mr. Santistevan does not wish to speak with you without counsel.  However, he is not foreclosing that option in the future.  I am sorry you have wasted your time.  I do have some questions for you.  Please contact me at (303) 279-7841, ext. 1375.

Sincerely,

Katherine Spengler
Department of the State Public Defender[1]

Id. at 114.  The agent read, photocopied, and returned the letter to Mr. Santistevan.  Id. at 146.  He then initiated the following conversation:

Agent: You have been advised by an attorney not to talk to me today, but it's totally up to you on whether you want to talk to me or not.  Do you want to come back to my office and answer questions about these robberies?

Mr. Santistevan: Yes.

Agent: Are you sure, without a lawyer present?

Mr. Santistevan: Yes, I want to.

Id.  As a result, he brought Mr. Santistevan to the FBI offices.  Id.

Upon arrival, the agent placed Mr. Santistevan in an interview room and turned on the video recorder.[2]  Id. at 148.  He first allowed Mr. Santistevan to

---

[1]  The actual letter was not admitted into evidence at the suppression hearing.  We include the letter as the district court did in its opinion, only correcting the spelling of attorney Spengler's name.

[2]  We reviewed the video, but find its contents irrelevant to our analysis.

spend one hour with Ms. Bryan and his mother. Id. Then, before beginning the interview, he had Mr. Santistevan review a Miranda rights form. Id. at 150. Mr. Santistevan read the form out loud, stated that he understood his rights, and signed the waiver. Id. at 151–52. Over the next three hours, Mr. Santistevan made incriminating statements with respect to two robberies. Id. at 158. Thereafter, the government filed an indictment on March 11, 2008, and a superceding indictment on November 3, 2010. Id. at 3, 14–20.

On January 26, 2011, Mr. Santistevan filed a motion to suppress statements made during the interview. Id. at 23–24. The district court held an evidentiary hearing at which the agent testified. Id. at 130–90. The court ordered supplemental briefing on new issues that were raised by the evidence. Id. at 12–13. In his supplemental brief, Mr. Santistevan argued that the agent violated his Miranda rights in three ways: (1) by questioning him after he invoked his right to silence at the time of his arrest; (2) by questioning him after his attorney told the agent that he did not wish to speak; and (3) by continuing to question him after he handed the agent a letter stating that he did not wish to be questioned without an attorney present. Id. at 101–11. The district court rejected Mr. Santistevan's first two arguments, but agreed with the third. Specifically, the district court found that (1) through his girlfriend, Mr. Santistevan had reinitiated contact with the agent after previously invoking his right to silence; (2) the attorney's phone call to the agent did not invoke Mr. Santistevan's Miranda

rights; and (3) Mr. Santistevan unambiguously invoked the right to counsel by handing the letter to the agent.  Id. at 112–29.  The court also determined that Mr. Santistevan was subject to a custodial interrogation when he invoked the right to counsel, and that the later waiver of his Miranda rights was invalid.  Id. at 124–25.

Discussion

On appeal, the government raises two arguments: (1) Mr. Santistevan did not unequivocally invoke the right to counsel by handing the letter drafted by his attorney to the agent; and (2) Mr. Santistevan was not in custody when he handed the letter to the agent.  Aplt. Open. Br. 9–11.  On its second point, the government requests that we remand to the district court to more fully develop the record.  Id. at 11.

Upon review of an order granting a motion to suppress, we accept the district court's factual findings unless clearly erroneous, viewing the evidence in the light most favorable to the district court.  United States v. Cook, 599 F.3d 1208, 1213 (10th Cir. 2010).  We review factual findings regarding the words a defendant used to invoke the right to counsel for clear error.  United States v. Brown, 287 F.3d 965, 971 (10th Cir. 2002).  "Whether those words actually invoked the right to counsel is a legal determination, reviewed de novo."  Id. (citation and quotation marks omitted).

In Edwards v. Arizona, 451 U.S. 477, 484–85 (1981), the Supreme Court established a bright-line rule that when a suspect has "expressed his desire to deal with the police only through counsel, [he] is not subject to further interrogation by the authorities until counsel has been made available," unless he initiates the contact. The Court revisited Edwards in Davis v. United States, 512 U.S. 452, 459 (1994), and clarified that a "suspect must unambiguously request counsel." The Court explained that "this is an objective inquiry[;]" a suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Id. Absent this "level of clarity, Edwards does not require that the officers stop questioning the suspect." Id. However, when the statement is clear, all questioning must stop; this bright-line rule "preserve[s] the integrity of an accused's choice to communicate with police only through counsel, by preventing police from badgering a defendant into waiving his previously asserted Miranda rights." Maryland v. Shatzer, 130 S. Ct. 1213, 1220 (2010) (citations and internal quotation marks omitted).

The district court made two factual findings that are relevant to our inquiry. First, the court found that the text of the letter "could not be any clearer; it stated 'Mr. Santistevan does not wish to speak with you without counsel.'" Aplt. App. 126. We agree with the district court, and find this language to be the "level of clarity" that Davis requires. See Davis, 512 U.S. at 459. Second, the district

court found that Mr. Santistevan "simply handed the letter" to the agent, and "by so doing ratified the contents of that letter as his own personal communication to the [a]gent." Aplt. App. 127. Reviewing for clear error, we do not believe that the district court clearly erred in reaching this conclusion. Like the district court, we find it relevant that Mr. Santistevan did not "dissociate[] himself from the contents of the letter. . . . [or] volunteer[] that despite the statement in the letter, he did, in fact, wish to be questioned." Id. at 126. As a result, we agree that Mr. Santistevan's act of handing the letter drafted by his attorney to the agent was an unambiguous invocation of the right to counsel.

The government urges us to reach a different conclusion by emphasizing that (1) Mr. Santistevan only presented the letter to the agent after being asked for it, and (2) Mr. Santistevan never asserted that he agreed with the contents of the letter. Aplt. Open. Br. 15. We are not persuaded. First, we find it irrelevant that the agent asked for the letter. At the suppression hearing, the agent testified that "[w]hen [he] arrived at the jail . . . . [he] asked if [Mr. Santistevan] had a letter . . . ." Aplt. App. 145–46. Mr. Santistevan did not forfeit his right to counsel just because the agent happened to speak first. Second, we do not believe that the Edwards bright-line rule places an additional burden on the suspect to specifically clarify that he intends to invoke the right to counsel. Rather, once the suspect unambiguously invokes the right to counsel—as Mr. Santistevan did here by giving the letter to the agent—all questioning must stop.

We also find the government's reference to <u>Moran v. Burbine</u>, 475 U.S. 412 (1986), unpersuasive. <u>See</u> Aplt. Reply Br. 4. In <u>Burbine</u>, the Supreme Court explained that only a defendant, and not an attorney, can invoke a defendant's Fifth Amendment rights. 475 U.S. at 433 n.4. However, we do not find <u>Burbine</u> dispositive because, in this case, the attorney did not just tell the agent that Mr. Santistevan did not wish to speak.[3] Rather, Mr. Santistevan himself told the agent that he did not wish to speak when he gave the letter to the agent and adopted its contents. Again, this clear act invoked Mr. Santistevan's right to counsel.

In the alternative, the government argues that, even if Mr. Santistevan invoked the right to counsel, the invocation was at best equivocal because Mr. Santistevan had requested to meet with the agent the previous night.[4] Aplt. Open. Br. 15. In support of this argument, the government cites our decision in <u>Brown</u>, 287 F.3d at 972–73, where we found that a defendant did not unequivocally invoke the right to counsel when he stated <u>simultaneously</u> that he wanted to answer questions without a lawyer present, wanted a lawyer, and wanted to talk to

---

[3] The district court found that the attorney's phone call to the agent did not invoke Mr. Santistevan's right to counsel. Aplt. App. 120–122. Because we find that Mr. Santistevan himself invoked the right to counsel, we need not address this point.

[4] We note that Ms. Bryan, and not Mr. Santistevan, spoke with the agent. The district court found that this conversation reinitiated contact for Mr. Santistevan. Aplt. App. 117–20. Because we find that Mr. Santistevan's later act—handing the letter to the agent—invoked the right to counsel, we need not reach this point and express no opinion on the dissent's view of it.

- 9 -

a lawyer. Aplt. Open. Br. 15–16 (emphasis added). Yet, the government's own choice of the word "<u>simultaneously</u>" is telling. Unlike the defendant in <u>Brown</u>, Mr. Santistevan did not <u>simultaneously</u> convey contradictory intentions. Rather, in giving the letter to the agent, his message was clear—he did not wish to speak without counsel present. Whatever discrepancy there may have been between Mr. Santistevan's intentions the previous night and that morning, this situation is a far cry from a defendant's ambiguity within the same sentence. <u>Cf.</u> <u>Valdez v. Ward</u>, 219 F.3d 1222, 1232 (10th Cir. 2000) (on habeas review, finding "Yes, I understand it a little bit and I sign it because I understand it something about a lawyer and he want to ask me questions and that's what I'm looking for a lawyer" equivocal). We thus conclude that Mr. Santistevan unambiguously invoked the right to counsel when he gave the letter drafted by his attorney to the agent.

In so holding, we note that it would be unfair to penalize Mr. Santistevan for changing his mind about speaking with the agent. It is well settled that a defendant, who has previously invoked the right to counsel, may change his mind and speak with police so long as the defendant "(a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." <u>Smith v. Illinois</u>, 469 U.S. 91, 95 (1984) (citing <u>Edwards</u>, 451 U.S. at 485, 486 n.9); <u>see</u> <u>United States v. Johnson</u>, 42 F.3d 1312, 1318 (10th Cir. 1994) (finding that a defendant waived his Fifth Amendment right to silence after reinitiating conversation with the police); <u>United States v. Comosona</u>, 848 F.2d

1110, 1113 (10th Cir. 1988) (same). If a defendant can change his mind to speak with police, it is only fair to allow him to do the opposite.

The government also challenges the district court's finding that Mr. Santistevan was subject to a custodial interrogation. Here, the government asks that we remand to more fully develop the record. We disagree that a remand is necessary. Instead, we find that Mr. Santistevan was subject to a custodial interrogation. The "Miranda-Edwards right to counsel prophylaxis" requires "both a custodial situation and official interrogation." United States v. Bautista, 145 F.3d 1140, 1147 (10th Cir. 1998). Like the district court, we find our decision in United States v. Kelsey, 951 F.2d 1196 (10th Cir. 1991), instructive. In Kelsey, the defendant, who had just been arrested, requested counsel before the police began to question him and before he was read his Miranda rights. Id. at 1198. Nonetheless, we found that the defendant was subject to a custodial interrogation because "the police intended to question [the defendant] at some point" in the near future. Id. at 1199. Here, Mr. Santistevan, who was also under arrest and in fact held in custody, knew that the agent was there to ask him questions. Therefore, interrogation was imminent, Mr. Santistevan could properly invoke his right to counsel, and to reiterate, he did so in an unequivocal manner when he handed the letter drafted by his attorney to the agent.

The dissent suggests that Mr. Santistevan's act of handing over the letter while remaining silent, in light of the agent's questioning, "created an

- 11 -

ambiguity." According to the dissent, Mr. Santistevan then needed to do more—or specifically, say more—to invoke his <u>Miranda</u> rights. This "no" means "maybe" approach is a recipe for ambiguity in every case and places too high a burden on a defendant to invoke counsel. The suggestion that a defendant must then explain his effort to invoke counsel at a suppression hearing compounds the problem. The government has the burden of proof and it is difficult to imagine competent defense counsel advising a client to testify in such circumstances, even given possible application of Rule 104(d). All that is required is that a defendant make an unambiguous request, sufficiently clear that a reasonable police officer understands it to be a request for counsel. <u>Davis</u>, 512 U.S. at 459. It does not require that a defendant, once making this invocation, further clarify his intentions.

The dissent also warns that our holding instructs law enforcement officers on how to get around <u>Miranda</u> by teaching them what questions to ask when they know a defendant has a letter from counsel. We would like to think that law enforcement officers act in good faith. Here the agent was plainly aware of the position of counsel and client. Regardless, it is our responsibility to apply the teachings of the Supreme Court given the facts before us.

AFFIRMED. The government's motion to withdraw its prior motion to correct its reply brief is GRANTED.

*United States v. Santistevan*, 11-1534

**TYMKOVICH**, J., dissenting.


The question in this appeal is whether Santistevan properly invoked his right to counsel. The facts are undisputed. Upon arriving at the jail, Agent Eicher asked, "Do you have a letter in your possession?" In response, Santistevan handed over a letter written by his attorney. The letter reported the attorney's understanding that Santistevan did not want to speak to law enforcement in the absence of an attorney. But Santistevan said nothing to Agent Eicher regarding whether his attorney's letter accurately reflected his own wishes. Agent Eicher then asked a clarifying question—"You have been advised by an attorney not to talk to me today, but it's totally up to you on whether you want to talk to me or not. Do you want to come back to my office and answer questions about these robberies?"—and in response Santistevan stated he wanted to speak to authorities. In my view, Agent Eicher properly respected Santistevan's constitutional right to counsel, and Santistevan properly exercised his right to waive counsel and speak to police. I therefore dissent.

The majority concludes Santistevan's failure to speak when handing over the letter amounted to a clear and unequivocal invocation of the right to counsel. But I believe the only conclusion we can draw is that Santistevan's silence, especially in light of the question Eicher asked, created an ambiguity. In the face of such ambiguity, a police officer had no duty to cease questioning. At a

minimum, the officer could permissibly ask clarifying questions, as Eicher did. Santistevan responded to those clarifying questions by knowingly and intelligently waiving his right to counsel. Accordingly, I would reverse the district court's suppression order.

## I.

No one disputes that Santistevan invoked his right to remain silent when Agent Eicher first arrested Santistevan. In such a situation, "the interrogation must cease," *Miranda v. Arizona*, 384 U.S. 436, 474 (1966)—as it did here—and the police may not attempt to continue questioning the suspect unless:

> (1) at the time the defendant invoked his right to remain silent, the questioning ceased; (2) a substantial interval passed before the second interrogation; (3) the defendant was given a fresh set of *Miranda* warnings; and (4) the subject of the second interrogation [is] unrelated to the first.

*Michigan v. Mosley*, 423 U.S. 96, 104–05 (1975).

But the *Mosley* test "is inapplicable . . . if the suspect, and not the police, reinitiates contact and agrees to questioning." *United States v. Alexander*, 447 F.3d 1290, 1294 (10th Cir. 2006). This exception traces back to *Edwards v. Arizona*, 451 U.S. 477 (1981), where the Supreme Court held that police must stop questioning a suspect who invokes his *Miranda* rights unless "the [suspect] himself initiates further communication, exchanges, or conversations with the

police." *Id.* at 485.[1]

Given that the majority upheld the district court's suppression order based on Santistevan's act of handing his attorney's letter to Agent Eicher, the majority does not address the third-party reinitiation question because the result would be the same (suppression) whether or not the majority disagrees with the district court's holding on third-party reinitiation. Maj. Op. at 9 n.4. Because I disagree with the majority on the significance of Santistevan's attorney's letter, I reach the third-party reinitiation question, and I would affirm the district court in that respect.

The circuits that have reviewed the issue agree that *Edwards* permits a suspect to reinitiate contact through a third party. The most elaborate discussion is in *Van Hook v. Anderson*, 488 F.3d 411 (6th Cir. 2007) (en banc), *cert. denied*, 552 U.S. 1023 (2007), which held that "[w]hen the police receive information that a suspect wants to talk; when there is a sufficient basis for believing its validity; and when the police confirm with the suspect the validity of that information," then "the suspect has adequately evinced a willingness and a desire to talk with them," *id.* at 424–25.

---

[1] *Edwards* focused on the right to counsel rather than the right to remain silent. It also involved a suspect who had waived his rights and then reasserted them. Nonetheless, we have applied *Edwards*'s reinitiation exception to right-to-silence cases, including cases where the suspect had not previously waived his rights. *See Alexander*, 447 F.3d at 1294; *United States v. Glover*, 104 F.3d 1570, 1580–81 (10th Cir. 1997), *abrogated on other grounds by Corley v. United States*, 556 U.S. 303 (2009).

Other circuits have similarly concluded that *Edwards* accommodates third-party reinitiation, or at least (on habeas review) that admitting a confession obtained through such circumstances is not contrary to clearly established law. *See Owens v. Bowersox*, 290 F.3d 960 (8th Cir. 2002), *cert. denied*, 537 U.S. 1035 (2002); *United States v. Michaud*, 268 F.3d 728 (9th Cir. 2001), *cert. denied*, 537 U.S. 867 (2002); *United States v. Gonzalez*, 183 F.3d 1315 (11th Cir. 1999), *cert. denied*, 528 U.S. 1144 (2000), *abrogated on other grounds as recognized in United States v. Diaz*, 248 F.3d 1065 (11th Cir. 2001).

Relying on the logic of these decisions, the district court concluded that third-party reinitiation in Santistevan's case was appropriate. I agree with this conclusion. In particular, I would hold that third-party reinitiation raises no *Miranda* problems in the circumstances here. Given that Eicher was not working with Santistevan's girlfriend to obtain Santistevan's consent to questioning, and that Eicher received sufficiently reliable information through the girlfriend that Santistevan wished to talk, Eicher appropriately returned to the jail with the intent to resume questioning.

Before moving to the primary question here, I also would affirm the district court's conclusion that the suspect must personally invoke his right to counsel in these circumstances. *See*, *e.g.*, *United States v. Muick*, 167 F.3d 1162, 1166 (7th Cir. 1999) (holding that "the [suspect's] attorney's letter and phone call [to police stating that his client would not talk without a lawyer] were insufficient to invoke

the *Miranda* right to counsel. Only [the suspect] could invoke his *Miranda* right to counsel." (citations omitted)); *State v. Hanson*, 401 N.W.2d 771, 778 (Wis. 1987) (holding that a letter written from the suspect's attorney to police instructing them not to talk with the suspect without the attorney present did not suffice to invoke the suspect's *Miranda* rights: "no one but the accused can make the decision to make a statement to the police or to ask for the assistance of counsel in making his decision").[2]  In particular, Santistevan's attorney could not invoke his right to counsel as she spoke with Agent Eicher over the phone.

Although attorneys generally speak for their clients, they do not necessarily do so in this context, and for sound reasons. Our justice system has no interest in establishing unnecessary barriers to cooperation with and confession to the police. *See*, *e.g.*, *Minnick v. Mississippi*, 498 U.S. 146, 155 (1990) ("Both waiver of rights and admission of guilt are consistent with the affirmation of individual responsibility that is a principle of the criminal justice system."). We can safely assume, however, that if attorneys may speak for their clients on the question of whether to invoke Fifth Amendment rights, lawyers will—out of understandable

---

[2] A few cases are to the contrary, but they are not persuasive. *See United States v. Johnson*, 752 F.2d 206, 211 n.3 (6th Cir. 1985) ("Although that privilege is personal to the client, it can be invoked on the client's behalf by the attorney." (citations omitted)); *Bigby v. INS*, 21 F.3d 1059, 1063 (11th Cir. 1994) ("on the particular facts of this case—*i.e.*, when an attorney invokes the Fifth Amendment on his client's behalf, the questioning party does not contemporaneously challenge the manner in which the privilege was raised, and all present including the presiding judge assume the privilege has been invoked—the invocation of the privilege is effective").

caution—nearly always invoke those rights. This would unnecessarily frustrate the police's legitimate desire to seek cooperation.

Exceptions might exist for suspects who are somehow incapable of communicating their desire for counsel, but that is not this case. Santistevan had no incapacity that prevented him from communicating his desire for an attorney directly to Eicher. Exceptions might also exist where everyone involved simply understands that the attorney is reporting the client's decision to invoke his right to counsel rather than making the decision for the client. *Cf. Brewer v. Williams*, 430 U.S. 387, 404 (1977) (upholding district court's conclusion that suspect had not waived his Sixth Amendment right to counsel given his constant interaction with his attorneys and their subsequent insistence to the police that they should not question the suspect); *Bigby*, 21 F.3d at 1063 (upholding attorney-invoked right to silence where "the questioning party [did] not contemporaneously challenge the manner in which the privilege was raised, and all present including the presiding judge assume[d] the privilege ha[d] been invoked").

But the distinction between reporting a client's decision and invoking on the client's behalf creates the potential for ambiguity from the police's perspective. The Supreme Court over the last twenty years has consistently chosen not to place the burden of ambiguity on the police. *See*, *e.g.*, *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2260 (2010) (holding that a suspect "who wants to invoke his or her right to remain silent [must] do so unambiguously"); *Davis v.*

*United States*, 512 U.S. 452, 459 (1994) (holding that *Edwards* does not require the police to cease questioning unless "the suspect . . . unambiguously request[s] counsel").

At a minimum, then, if there exists a distinction between reporting a suspect's decision and invoking on the suspect's behalf, the police should be permitted to ask the suspect directly whether the lawyer accurately reported the suspect's decision. This is what Eicher did when he eventually arrived at the jail and inquired regarding Santistevan's intentions.

Accordingly, no matter how we look at Santistevan's situation, his attorney's phone call to Eicher as Eicher drove to the jail did not invoke his Fifth Amendment right to counsel.

## II.

Turning to whether Santistevan's act of handing his lawyer's letter to Eicher at the jail invoked his right to counsel, I agree we start with *Davis v. United States*.

In *Davis*, the Supreme Court announced that equivocal or ambiguous invocations of the right to counsel do not trigger the *Edwards* rule. Rather, the suspect must "articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." 512 U.S. at 459. "But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable

officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," the police may continue questioning. *Id.* (emphasis in original).

Thus, the question here is whether Santistevan unambiguously requested counsel. "When reviewing an invocation of the right to counsel, specifically, we review for clear error the district court's factual findings concerning the words a defendant used in invoking the right to counsel. Whether those words actually invoked the right to counsel is a legal determination, reviewed de novo." *United States v. Zamora*, 222 F.3d 756, 765 (10th Cir. 2000) (internal quotation marks omitted).

It bears repeating here the entire portion of Agent Eicher's testimony on which the district court based its conclusion that Santistevan had unambiguously requested counsel:

> Q.    So after speaking to [Santistevan's defense attorney on the way to the jail], you proceeded to the jail?
>
> A.    That's correct, I did.
>
> Q.    Okay.  And then did you speak with Mr. Santistevan?
>
> A.    I did.  When I arrived at the jail I advised Mr. Santistevan that I had talked to an attorney that claimed to be representing him.  And I asked if he had a letter in his possession.  And he did, and he handed me the letter.  I read the letter.  I made a photocopy at that point, gave the letter back to Mr. Santistevan.
>
> Then I asked Mr. Santistevan, I said: You have been advised by an attorney not to talk to me today, but it's totally up to you on

whether you want to talk to me or not. Do you want to come back to my office and answer questions about these robberies?

And he said, Yes, he did.

And I said: Are you sure, without a lawyer present?

And he said: Yes, I want to.

So then we transported him back to [Eicher's office].

App. 145–46.

Santistevan could have testified to his own side of the story without waiving his Fifth Amendment rights. *See* Fed. R. Evid. 104(d) ("By testifying on a preliminary question, a defendant in a criminal case does not become subject to cross-examination on other issues in the case."); *cf. Simmons v. United States*, 390 U.S. 377, 394 (1968) ("when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection"). But Santistevan put on no evidence of any kind at the suppression hearing. Accordingly, this testimony from Eicher is the sum total of evidence from which to conclude whether Santistevan invoked his right to counsel.[3]

The district court reasoned as follows to conclude that Santistevan's act of handing his attorney's letter to Eicher unambiguously invoked the right to counsel:

---

[3] I would remand to the district court for further development of the record on the question of whether a custodial interrogation took place at this time.

> The Court finds that, by handing attorney Spangler's letter to Agent Eicher, Defendant affirmatively and unequivocally invoked his right to counsel. Defendant could have declined to present Agent Eicher the letter or could have told the Agent that he dissociated himself from the contents of the letter. Defendant also could have volunteered that despite the statement in the letter, he did, in fact, wish to be questioned. However, Defendant did none of those things. He simply handed the letter—which clearly stated that he did not wish to speak with Agent Eicher without his attorney present—to Agent Eicher, and by so doing ratified the contents of that letter as his own personal communication to the Agent.

App. __ -__ [**District Court ECF #172 at 15-16**].

The district court based its conclusion entirely on what Santistevan *could have said but did not* when he handed the letter to Eicher. For multiple reasons, this is insufficient to conclude that Santistevan invoked his right to counsel. First, the district court's analysis loses track of the overarching question: whether Santistevan "articulate[d] his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney," rather than "mak[ing] a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel." *Davis*, 512 U.S. at 459 (emphasis in original). When placed in the light of this standard, the district court's analysis necessarily implies that a reasonable police officer under the circumstances would have taken Santistevan's silence as unequivocal or unambiguous because of what Santistevan might have said at that point.

- 10 -

But silence cuts in many directions. Santistevan indeed could have "dissociated himself from the contents of the letter," App. at 126, and he also could have endorsed its contents; he "could have volunteered that despite the statement in the letter, he did, in fact, wish to be questioned," Id., and he could have volunteered that his attorney's words accurately reflected his current wishes. But he "did none of those things. He simply handed the letter . . . ." Id.

It is difficult to see how that amounts to an unambiguous assertion of the right to counsel. It is especially difficult to see how a reasonable police officer is supposed to know that the inference to be drawn from the suspect's failure to disapprove the letter (ratification) somehow unequivocally overpowers any inference to be drawn from the suspect's failure to endorse the letter (disagreement).

At best, then, under the facts here the act of handing over the letter and remaining silent created competing inferences—the very definition of an ambiguous situation. The ambiguity is deepened in the context of Agent Eicher's uncontested account about the reason why Santistevan handed Eicher the letter. Santistevan did *not* hand over the letter in response to a question regarding whether he wanted counsel. Rather, said Eicher, "When I arrived at the jail I advised Mr. Santistevan that I had talked to an attorney that claimed to be representing him. And I asked if he had a letter in his possession. And he did, and he handed me the letter." App. 145–46. I disagree with the district court's

- 11 -

conclusion that handing over a letter in response to a request to see the letter is the unequivocal invocation *Davis* requires.

The majority avoids the effect of Eicher's first question by characterizing it as an "irrelevant" question of happenstance: "Mr. Santistevan did not forfeit his right to counsel just because the agent happened to speak first." Maj. Op. at 8. But imagine if Eicher's first words had instead been, "Do you want a lawyer before you talk to me?" I doubt the majority would cast aside *those* words as irrelevant to the question of equivocation.

Our task is to decide whether Santistevan's conduct—which in this case turned out to be the act of handing over a letter while remaining silent—sufficed to invoke his right to counsel. Surely the question to which a suspect's conduct responded is relevant to that task.

Given these circumstances, under the majority's approach, the takeaway is this: law enforcement officers who learn about a letter from an attorney should first secure the suspect's *Miranda* waiver before asking to see the letter—or better yet, not ask for the letter at all, thus preventing the supposedly unambiguous act of handing over a letter from ever happening. Accordingly, in upholding Santistevan's Fifth Amendment rights here, the majority opinion implicitly demonstrates how law enforcement officers in similar situations can easily get around those rights.

But returning to the central question here—whether Santistevan unambiguously invoked his right to counsel—the answer is no. A reasonable officer could question whether the act of handing over the letter in response to a request to see the letter is meant to invoke the right to counsel. Thus, under the *Davis* and *Edwards* standards, Eicher had no duty to cease questioning. Accordingly, I would reverse the suppression order.